## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **INTERNATIONAL COUNSEL BUREAU** )<br>    Dasman Commercial Complex    )<br>    Block No. 3 -- 8th Floor    )<br>    Al Sharq    )<br>    Safat    )<br>    Kuwait    )<br>    )<br>**and**    )<br>    )<br>**PILLSBURY, WINTHROP, SHAW,**    )<br>**PITTMAN, LLP,**    )<br>    2300 N Street, N.W.    )<br>    Washington, D.C.  20037    )<br>    )<br>o/b/o FAWZI KHALED ABDULLAH    )<br>FAHAD AL ODAH; FOUAD MAHMOUD )<br>AL RABIAH; KHALID ABDULLAH    )<br>MISHA'AL AL-MUTAIRI; AND FAYIZ    )<br>MOHAMMED AHMED AL KANDARI,    )<br>    )<br>    **Plaintiffs,**    )<br>    )<br>    **v.**    )<br>    )<br>**UNITED STATES DEPARTMENT OF**    )<br>**DEFENSE**    )<br>    The Pentagon    )<br>    Washington, D.C.  20330    )<br>    )<br>    **Defendant**.    )<br>_____) | Civil Action No. _____<br><br>**COMPLAINT** |

## PRELIMINARY STATEMENT

1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552

*et seq.*, seeking an order requiring the Defendant, Department of Defense ("DOD") and its

components, to immediately produce agency records requested by Plaintiff International Counsel

Bureau ("ICB") and by Plaintiff Pillsbury, Winthrop, Shaw, Pittman LLC ("PWSP") on behalf of

four Kuwaiti citizens currently detained in the U.S. prison facility at Guantanamo Bay, Cuba:

Fawzi Khaled Abdullah Fahad A1 Odah; Fouad Mahmoud A1 Rabiah; Khalid Abdullah

Misha'al Al-Mutairi; and Fayiz Mohammed Ahmed Al Kandari ("the Kuwaiti Detainees").

2.     On March 12, 2008, Plaintiff ICB, Kuwaiti Counsel for the families of Kuwaiti

citizens at Guantanamo Bay, submitted its FOIA request to the Defendant seeking any and all

video, audio or other recordings of the Kuwaiti Detainees at Guantanamo Bay ("the Recording

Request"). (*See* Attachment A.)  The Recording Request was later joined by the law firm

Pillsbury, Winthrop, Shaw, Pittman LLC ("PWSP"), on behalf of the Kuwaiti Detainees, whom

PWSP represents. (*See* Attachment B.)  ICB, PWSP, and the Kuwaiti Detainees (collectively,

"Recording Requesters") are therefore the Requesters for the Recording Request.

3.     Defendant has not released any records to the Recording Requesters, has not

provided any explanation for this failure, and has otherwise failed to meet its obligations under

the FOIA.

4.     Also on March 12, 2008, Plaintiff PWSP, on behalf of Kuwaiti detainees Fouad

Mahmoud A1 Rabiah and Khalid Abdullah Misha'al Al-Mutairi ("Medical Records

Requesters"), submitted a FOIA request to the Defendant for a complete set of medical records

and/or psychological records in the possession of Defendant, including various specific

categories of records ("the Medical Records Request"). (*See* Attachment C.)  The Medical

Records Request was accompanied by properly completed authorization forms executed,

respectively, by Messrs. Al Rabiah and Al-Mutairi, which identified PWSP as counsel for each

of them and authorized the release of their respective medical records to PWSP. (*Id.*)

2

5.     Defendant has not released any records to the Medical Records Requesters, has not provided any explanation for this failure, and has otherwise failed to meet its obligations under the FOIA.

6.     Plaintiffs seek an order requiring Defendant to immediately process both the Recording Request and the Medical Records Request, and to release all records that have been unlawfully withheld.  The detainee Requesters, represented by Requester PWSP, are held under strict security conditions and have no contact with non-jailers except tightly controlled attorney visits and infrequent letters, and may be subjected to abusive practices during their ongoing, indefinite, and illegal internment at Guantanamo.  Requester ICB represents the families of the Kuwaiti Detainees, for whom FOIA is a primary way for them to learn any details regarding the health, safety, and condition of their children.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action and these parties pursuant to 5 U.S.C. §§ 552 (a)(4)(B) and 552(a)(6)(E)(iii).  This Court also has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331.  Venue lies in this district pursuant to 5 U.S.C. § 552 (a)(4)(A) and (B).

## PARTIES

8.     Plaintiff ICB is a Kuwaiti law firm representing the families of the Kuwaiti Detainees.

9.     Plaintiff Pillsbury Winthrop Shaw Pittman, LLP is a law firm that represents the Kuwaiti Detainees and Plaintiff ICB.

10.     Plaintiffs Fawzi Khaled Abdullah Fahad Al Odah; Fouad Mahmoud Al Rabiah; Khalid Abdullah Misha'al Al-Mutairi; and Fayiz Mohammed Ahmed Al Kandari are Kuwaiti citizens currently detained by the U.S. Government at Guantanamo Bay, Cuba.

11.     Defendant DOD is a Department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

## FACTS

### I.     INTERNMENT OF THE KUWAITI DETAINEES BY THE U.S. MILITARY AT GUANTANAMO BAY

12.     The Kuwaiti Detainees are four Kuwaiti citizens who were taken into custody by the U.S. Military either in Afghanistan or at or near the Afghanistan-Pakistan border in late 2001 and early 2002.

13.     All four of the Kuwaiti Detainees were in Afghanistan in the Fall of 2001, assisting refugees and performing other charitable activities. After the conflict in Afghanistan began in the aftermath of the September 11th, 2001 attacks on the United States, the Kuwaiti Detainees sought to flee Afghanistan. Unable to return directly to Kuwait, they attempted to travel over land to Pakistan. They subsequently were captured or detained, two by Northern Alliance soldiers and two by the Pakistani government, and turned over to the United States military. All four Kuwaiti detainees have been held at Guantanamo Bay since 2002.

14.     Despite more than six years of internment and interrogation, the Kuwaiti Detainees have not been formally charged with any crime. DOD Secretary Robert Gates stated recently that the U.S. Government has no intention of closing its prison at Guantanamo Bay.

15.     DOD has asserted that the Geneva Convention and its protections do not apply to the Kuwaiti Detainees, or to others held at Guantanamo. Press and other accounts suggest that

these protections are not, in fact, respected, and that detainees are subjected to violence, isolation, unconsented drugging, and religious discrimination.

16.    Upon information and belief, Defendant possesses substantial documentary records of the appearances, daily lives, physical and mental condition, and treatment of the Kuwaiti Detainees, but has failed and refused to produce them, despite its obligation under 5 U.S.C. § 552 *et seq.*

## II.    THE RECORDING REQUEST

17.    On March 12, 2008, the Recording Requesters filed a FOIA request seeking: "Any recording, including any image, photograph, picture, film, drawing, painting, video, videotape, tape recording, audiotape, CD, or DVD, depicting or reflecting the image, likeness, voice, audible action, or any other aspect or activity of any Detainee. This request is not limited to any particular recordable format and includes images stored electronically; paper or other hard copies of still images; real-time and timed-refresh video; transcripts of audio recordings, and any and all other viewable, listenable or otherwise reviewable records."

18.    Media accounts, statements of DOD officials, and documents obtained in other FOIA litigation relating to Guantanamo Bay strongly suggest that activities at Guantanamo Bay are routinely recorded, and that such recordings are preserved. As only one example, Rear Admiral Mark H. Buzby, former Commander of Guantanamo, in a sworn affidavit, declared that there were and are multiple video surveillance systems in use at Guantanamo, stating: "The detainees at JTF-GTMO are housed in various detention camps. Activities taking place in Camps 4, 6, Echo, and Iguana have been recorded 24 hours per day, seven days per week by means of digital video recording (DVR) systems that are part of the video monitoring systems

that guards use to ensure good order and discipline within the camps." (*See* Attachment D, Declaration of Rear Admiral Mark H. Buzby at ¶ 2.)

19.     In addition to recording routine operations described by Rear Admiral Buzby, press reports have stated that "[d]ozens of videotapes of American guards allegedly engaged in brutal attacks on Guantanamo Bay detainees have been stored and catalogued at the camp."

20.     There is no justification for withholding the recordings of the Kuwaiti Detainees. PWSP, one of the Recording Requesters, is legal counsel to the Detainees themselves, and the families of the Detainees have no objection to the release of the recordings. Prior courts have ordered the release of such photographic and video records, and denied DOD's efforts to protect such records under various FOIA exceptions. *See, e.g., American Civil Liberties Union v. Department of Defense*, 389 F.Supp.2d 547 (S.D.N.Y. 2005).

## III.    THE MEDICAL RECORDS REQUEST

21.     On March 12, 2008, the Medical Record Requesters filed a FOIA request seeking medical records as enumerated in Attachment C.

22.     The medical conditions of Fouad Mahmoud Al Rabiah and Khalid Abdullah Misha'al Al-Mutairi, the two Kuwaiti Detainees who are the subject of the Medical Record Request, is an open and critical question. Numerous sources in the press and otherwise have reported a "profound deterioration" in the mental and physical health of many being held in Guantanamo. There are reports of Guantanamo detainees refusing necessary, even life saving, medical care because of the inadequacy of the medical facilities and medical care. Other reports have described serious mental problems emerging in the detainee population, with "many prisoners already in despair at being held in indefinite detention . . . dangerously close to full-blown mental and physical breakdown."

23.     One factor in the emerging health crisis is the compromised medical care system at Guantanamo Bay.  In February 2006, the U.N. Commission on Human Rights found that health professionals at Guantanamo had been "complicit in abusive treatment of detainees detrimental to their health."  New allegations have emerged that the doctors at the camp were complicit in involuntary drugging of detainees, for the purposes of interrogation.  These allegations have been corroborated by internal Department of Justice memoranda authorizing such drugging.  Quoting a report of the International Committee of the Red Cross, the 2006 U.N. Report noted that the health care of detainees had been compromised because the medical care systems at the camp had been "integrated" into the "system of coercion" at the camp, and interrogators were using information from medical files in their interrogations.  As a result, the Red Cross found, the inmates were not cooperating with the doctors.  Press accounts have confirmed that interrogation teams had access to medical records.

24.     The reported facts related in Paragraph 23 not only indicate that the Guantanamo Bay medical care system is compromised, but confirm that detainee medical records exist, and may be produced by the Defendant.

25.     Despite these reported facts, neither the Medical Records Requesters, the families of the Kuwaiti Detainees who are the subjects of the Medical Records Request, nor PWSP as counsel for the Medical Records Requesters have been provided with complete information concerning the medical or psychological health or treatment of the subjects of the Medical Records Request.  Repeated accounts of abuses of detainees by Defendant provide reason to believe that the subjects of the Medical Records Request may have been tortured and abused with the assistance of medical personnel.  Accounts have emerged from Guantanamo Bay specifically describing "extremely harsh" treatment of Kuwaiti Detainee Al Rabiah.

26.    Moreover, there is no justification for withholding the requested records, as the Medical Records Request was accompanied by signed requests from the Kuwaiti Detainees who are the subjects of the Medical Records Request.

## IV.    RESPONSE TO RECORDING REQUEST

27.    By a letter dated March 20, 2008 from Will Kammer, Department of Defense, Office of Freedom of Information, 1155 Defense Pentagon, Washington, DC 20301-1155, DOD informed Plaintiff ICB that the Recording Request had been received and that the request for expedited processing had been denied ("Recording Response Letter"). The letter indicated that the Recording Request had been assigned Reference Number 08-F-0863. (*See* Attachment E.)

28.    The Recording Response Letter did not address in any way the status of the Recording Request.  In fact, the letter was completely silent regarding whether the request had even been examined by DOD, beyond the request for expedited treatment.  The letter did not indicate any timetable for response to the request, and did not indicate that the request was under substantive consideration at all.

29.    The Recording Response Letter stated that "as [ICB] has not identified [itself] as legal counsel for the named detainees, certain privacy protected information may be denied."

30.    On March 31, 2008, PWSP, counsel for the individual Kuwaiti Detainees, joined the Recording Request as a Requester on behalf of the Kuwaiti Detainees.

31.    On or about April 7, 2008, Jeannie Miller, the responsible DOD official for the Recording Request, informed ICB counsel that PWSP's joining of the Recording Request on behalf of the Kuwaiti Detainees had removed any privacy concerns.

32.    The Recording Request was filed over three months ago, and DOD has made no substantive response.

8

## V.    RESPONSE TO MEDICAL RECORDS REQUEST

33.    By letter dated March 20, 2008, from Will Kammer, Department of Defense,

Office of Freedom of Information, 1155 Defense Pentagon, Washington, DC 20301-1155, DOD

informed Plaintiff PWSP that the Medical Records Request had been received and that the

request for expedited processing had been denied ("Medical Records Response Letter"). The

letter indicated that the Medical Records Request had been assigned Reference Number 08-F-

0852. (*See* Attachment F.)

34.    The Medical Records Response Letter did not address in any way the status of the

Medical Records Request. In fact, the letter was completely silent regarding whether the request

had even been examined by DOD, beyond the request for expedited treatment. The letter did not

indicate any timetable for response to the request, and did not indicate that the request was under

substantive consideration at all.

35.    The Medical Records Request was filed over three months ago, and DOD has

made no substantive response.


## CAUSES OF ACTION

First Cause of Action:
Violation of FOIA for Failure to Make Promptly Available
the Records Sought by the Recording and Medical Records Requests

36.    Plaintiffs incorporate by reference and reallege paragraphs 1-35.

37.    Defendant's failure to make promptly available the records sought by the

Recording and Medical Records Requests violates FOIA, 5 U.S.C. § 552 (a)(3)(A).

<u>Second Cause of Action:</u>
<u>Violation of FOIA for Failure to Timely Respond to the Recording and Medical Records</u>
<u>Requests</u>

38.    Plaintiffs incorporate by reference and reallege paragraphs 1-35.

39.    Defendant's failure to timely respond to the Recording and Medical Records

Requests violates FOIA, 5 U.S.C. § 552 (a)(6)(A)(i), and Defendant's own regulations

promulgated thereunder.

<u>Third Cause of Action:</u>
<u>Violation of FOIA for Failure to Release Records Sought by the Recording and Medical Records</u>
<u>Requests</u>

40.    Plaintiffs incorporate by reference and reallege paragraphs 1-35.

41.    Defendant's failures to release records sought by the Recording and Medical

Records Requests violates FOIA, 5 U.S.C. § 552 (a).

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a)    ORDER Defendant to immediately process the Recording Request and the
       Medical Records Request, and to disclose the records requested;

b)    EXPEDITE this proceeding as provided for in 28 U.S.C. § 1657;

c)    SET a schedule for producing requested records to Plaintiffs;

d)    AWARD Plaintiffs their costs and reasonable attorneys' fees incurred in this
       action; and

e)    GRANT such other relief as the Court may deem just and proper.

Respectfully submitted,
ARNOLD & PORTER LLP

By: _____
Ronald A. Schechter (D.C. Bar No. 245019)
Stuart Turner (D.C. Bar No. 478392)

555 12th Street, N.W.
Washington, D.C.  20004
Tel: (202) 942-5000
Fax: (202) 942-5999
Email:  ronald.schechter@aporter.com
            stuart.turner@aporter.com

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

### I (a) PLAINTIFFS

INTERNATIONAL COUNSEL BUREAU and PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP o/b/o FAWZI KHALED ABDULLAH FAHAD AL ODAH; FOUAD MAHMOUD AL RABIAH; KHALID ABDULLAH MISHA 'AL AL-MUTAIRI; AND FAYIZ MOHAMMED AL KANDARI

### DEFENDANTS

United States Department of Defense

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    99999
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Ronald A. Schechter
Stuart Turner
Arnold & Porter LLP
555 12th Street, N.W.
Washington, DC 20004

ATTORNEYS (IF KNOWN)

The Pentagon
Washington, D.C. 20330

### II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV.  CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. Antitrust

□ 410 Antitrust

○ B. Personal Injury/ Malpractice

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

○ C. Administrative Agency Review

□ 151 Medicare Act

Social Security:
□ 861 HIA ((1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

Other Statutes
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

Real Property
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

Personal Property
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

Bankruptcy
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

Prisoner Petitions
□ 535 Death Penalty
□ 540 Mandamus & Other
□ 550 Civil Rights
□ 555 Prison Condition

Property Rights
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

Federal Tax Suits
□ 870 Taxes (US plaintiff or defendant
□ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational Safety/Health
□ 690 Other

Other Statutes
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC Rates/etc.
□ 460 Deportation

□ 470 Racketeer Influenced & Corrupt Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/ Exchange
□ 875 Customer Challenge 12 USC 3410
□ 900 Appeal of fee determination under equal access to Justice
□ 950 Constitutionality of State Statutes
□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ⊙ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)  *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act)  *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Freedom of Information Act Case seeking order directing compliance with statute

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    **DEMAND $** _____ Check YES only if demanded in complaint    **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 6/20/08    SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed *only* if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the *primary* cause of action found in your complaint. You may select only *one* category. You *must* also select *one* corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

```
************************
***   TX REPORT   ***
************************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 1186 |
| CONNECTION TEL | 036964506p18814#002# |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 03/12 11:00 |
| USAGE T | 04'48 |
| PGS. SENT | 17 |
| RESULT | OK |

# ARNOLD & PORTER LLP

202.942.5000
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC  20004-1206

## Fax Transmittal

March 12, 2008

| RECIPIENT NAME(S) | RECIPIENT FAX NUMBER(S) | RECIPIENT TELEPHONE NUMBER(S) | RECIPIENT ROOM #(S) |
|---|---|---|---|
| Karen M. Finnegan | 703-696-4506 | | |
| **SENDER** | **SENDER'S TELEPHONE NUMBER** | **SENDER'S ROOM NUMBER** | |
| Ronald A. Schechter | 202-942-5160 | 1083 | |
| **CLIENT/MATTER NUMBER** | **TIMEKEEPER NUMBER** | **NUMBER OF PAGE(S)** | |
| 18814.002 | 4316 | We are transmitting **17** page(s) (including this cover sheet) | |
| **TRANSMISSION DEADLINE (DATE & TIME)** | | **ALTERNATE TELEPHONE NUMBER (OPTIONAL)** | |
| This document must be transmitted no later than: | | Alternate telephone number at which the sender can be reached if there are difficulties with this fax: | |

If you experience difficulty receiving this fax transmission, please contact the operator at 202.942.5837.

**MESSAGE**

# ARNOLD & PORTER LLP

**Ronald A. Schechter**
Ronald_Schechter@aporter.com

202.942.5160
202.942.5999 Fax

555 Twelfth Street, NW
Washington, DC 20004-1206

March 12, 2008

## VIA CERTIFIED MAIL AND FACSIMILE - (703) 696-4506

Karen M. Finnegan
Office of Freedom of Information
Department of Defense
1155 Defense Pentagon
Washington, D.C. 20301-1155

      Re:    **Freedom of Information Act Request**

Dear Ms. Finnegan:

      This letter constitutes a request for records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq., and corresponding regulations, on behalf of the International Counsel Bureau, Kuwaiti Counsel for the families of Kuwaiti Citizens at Guantanamo Bay ("Requester"). This request seeks to obtain video, photographic, and other recorded documents as specified in more detail below, related to the following individuals who are presently detained at Guantanamo Bay Naval Base, Cuba ("Guantanamo"):

> Fawzi Khaled Abdullah Fahad Al Odah;
> Fouad Mahmoud Al Rabiah;
> Khalid Abdullah Misha'al Al-Mutairi; and
> Fayiz Mohammed Ahmed Al Kandari

(collectively, "Detainees")[1]. Please be advised that Requester seeks expedited processing of this request pursuant to 32 C.F.R. § 286.4(d)(3).

## I.    Records Sought

      Requester seeks the following records:

      Any recording, including any image, photograph, picture, film, drawing, painting, video, videotape, tape recording, audiotape, CD, or DVD, depicting or reflecting

---

[1] Please note that this and all subsequent uses of the capitalized terms "Detainee" or "Detainees" refers only to the four named Detainees, and not to the Guantanamo detainee population in general.

# ARNOLD & PORTER LLP

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 2

the image, likeness, voice, audible action, or any other aspect or activity of any Detainee. This request is not limited to any particular recordable format and includes images stored electronically; paper or other hard copies of still images; real-time and timed-refresh video; transcripts of audio recordings, and any and all other viewable, listenable or otherwise reviewable records.

## II.    Requester Is Entitled to Expedited Processing

Expedited processing of a FOIA request is warranted here because there is a "compelling need for the information" by the Requester to gain access to the records relating to the Detainees' treatment at Guantanamo. 32 C.F.R. § 286.4(d)(3). A compelling need is present here because the failure to obtain records on an expedited basis could "reasonably be expected to pose an imminent threat to the life or physical safety" of the Detainees, because Detainees face an "imminent loss of substantial due process rights," and because of "humanitarian need." *Id.* §§ 286.4(d)(3)(i), 286.4(d)(3)(iv).

Numerous sources have reported a "profound deterioration" in the mental and physical health of many being held in Guantanamo. *See, e.g.*, AP, *Annan: Shut Guantanamo prison camp,* February 17, 2006 (*available at* www.cnn.com). For example, in February 2006, the U.N. Commission on Human Rights reported that detainees at Guantanamo were subject to "abusive treatment" which was "detrimental to their health." U.N. Econ. & Soc. Council [ECOSOC], Commission on Human Rights, *Situation of detainees of Guantanamo Bay, Report of the Chairperson of the Working Group on Arbitrary Detention,* T 75, U.N. Doc. E/CN.4/2006/120 (February 15, 2006). Other reports have described serious mental problems emerging in the detainee population arising from long-term solitary confinement, and other conditions of imprisonment. "[M]any prisoners [are] already in despair at being held in indefinite detention . . . some are dangerously close to full-blown mental and physical breakdown." *See* BBC News, *Guantanamo Conditions 'Worsening',* April 3, 2007 (*available at* http://news.bbc.co.uk/2/hi/americas/6526589.stm).

Despite these reports, neither the Detainees, their families, nor the public have been provided with any information regarding the health and safety of the Detainees. No

# ARNOLD & PORTER LLP

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 3

medical reports or records have been provided to the families,[2] and there is reason to believe that Detainees may have been tortured and abused given the repeated accounts of abuses of detainees by the military, including specific references to at least one of the Detainees. *See, e.g.,* Rania El Gamal, *Kuwaiti Gitmo Detainees Speak Out About Abuse,* Kuwait Times, December 1, 2006 (former Kuwaiti detainees describing abusive conditions at Guantanamo); Josh White, *U.S. Is Found Lacking in Detainee Care Plans,* Washington Post, July 9, 2005 (noting that Behavior Science Consultation Teams "had access to medical records at the U.S. detention facility in Guantanamo Bay, Cuba,"); Shafra Rasul, Asif Iqbal and Rhuhel Ahmed, *Composite Statement: Detention* in *Afghanistan and Guantanamo Bay,* at ¶ 306 *(available at* http://www.statewatch.org/news/2004/aug/ guantanamo-statement.pdf) (former detainees describing "extremely harsh treatment" of Detainee Al Rabiah); AP, *Three Britons allege abuses under U.S. custody at Guantanamo,* USA Today.com, August 4, 2004; David Rose and Gaby Hinsliff, *US Guards 'Filmed Beatings' at Terror Camp,* Guardian Unlimited, May 16, 2004 *(available at* Observer.Guardian.uk.com); *Bosnian Citizens Imprisoned at Guantanamo Complain About Health Problems,* BBC Monitoring International Reports, August 3, 2004; Department of Defense/Department of Justice, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations,* March 6, 2003 (rationalizing that compliance with international treaties and U.S. laws prohibiting torture could be overlooked because of legal technicalities and national security needs).

Detainees' families, physicians and counsel have limited means of determining the physical or mental conditions of the Detainees, and thus are denied the complete information necessary to permit them to take the steps to seek relief for their loved ones and clients based upon urgent medical or psychological need. Because of their mistreatment at Guantanamo, continuation of this silence by non-expedited processing could reasonably be expected to pose an imminent threat to their life and physical safety. *Id.* § 286.4(d)(3)(i). Detainees currently cannot obtain adequate medical care and treatment because their families and physicians have no indication of what physical and/or behavioral symptoms they may display while in detention under extremely stressful conditions. Expedited processing is therefore warranted. *Id.*

---

[2] A separate FOIA request seeking the medical records of two of the Detainees, Fouad Mahmoud Al Rabiah and Fayiz Mohammed Ahmed Al Kandari, is being submitted under separate cover.

# ARNOLD & PORTER LLP

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 4

Moreover, expedited processing is warranted because Detainees face an "imminent loss of substantial due process rights." 32 C.F.R. § 286.4(d)(3)(iv). Here, the denial of Detainees' substantial due process rights is not only imminent, but also present and on-going for as long as Detainees are detained. Neither the Detainees, their families, nor the public have been provided with information concerning Detainees' medical or psychological health or treatment, and, given the repeated accounts of abuses of detainees and emergent medical and psychological crises among the detainee population cited above, there is reason to believe that Detainees were tortured and abused, in violation of their substantial due process rights.

Finally, given the intense interest in the care and treatment of all detainees at Guantanamo by the United Nations, the International Red Cross, and the general public, disclosing recorded sounds, images, and other recordings will promote the "welfare and interest of mankind" and expedited processing is therefore warranted. *Id.*

\*     \*     \*

There is no doubt that recordings of the Detainees are maintained in a manner readily accessible to the Department of Defense and its Components. No less an authority than Rear Admiral Mark H. Buzby, Commander of Guantanamo, in a sworn affidavit, declared that there were and are multiple video surveillance systems in use at Guantanamo:

> The detainees at *JTF-GTMO* are housed in various detention camps. Activities taking place in Camps 4, 6, Echo, and Iguana have been recorded 24 hours per day, seven days per week by means of digital video recording (DVR) systems that are part of the video monitoring systems that guards use to ensure good order and discipline within the camps.

Declaration of Rear Admiral Mark H. Buzby, para. 2 (attached hereto as Exhibit A.) According to Rear Admiral Buzby, video recordings from these systems have been at least partially preserved. Further, press reports have stated that "[d]ozens of videotapes of American guards allegedly engaged in brutal attacks on Guantanamo Bay detainees have been stored and catalogued at the camp." David Rose and Gaby Hinsliff, *US Guards 'Filmed Beatings' at Terror* Camp, Guardian Unlimited, May 16, 2004 *(available at* Observer.Guardian.uk.com). These and other recordings as defined above concerning

# ARNOLD & PORTER LLP

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 5

each Detainee should be readily accessible to the Department of Defense and its
Components.

FOIA and Department of Defense implementing regulations provide that if some
parts of records containing the requested information are exempt from mandatory
disclosure, then non-exempt materials shall be disclosed after the exempt material has
been deleted. *See* U.S.C. § 552(b); 32 C.F.R. § 286.23(d). Therefore, if you determine
that some portion of a responsive record is exempt, please provide a copy of the
remainder of the record. Additionally, if you determine that some or all of the requested
records are exempt from disclosure, please provide a list or index of the records withheld,
the exemption invoked, an estimation of the volume of records denied, and the reasons
why a discretionary release of the records would not be appropriate under Department of
Defense implementing regulations and the agency's FOIA policy. *See* 32 C.F.R.
§ 286.23(e).

If you are aware of another Component of the Department of Defense that is or
could be in possession of the requested records, please provide the name and address of
the appropriate Component. Requester is willing to reimburse up to $5,000 for each
Detainee of search and duplication fees incurred by the Department of Defense related to
this request.

Thank you for your consideration of this request. Please direct all future responses
to my attention at:

> Ronald A. Schechter
> Arnold & Porter, LLP
> 555 12th Street, NW
> Washington, DC 20004
> Tel:     202.942-5160
> Fax:     202.942-5999
> Email:   ronald.schechter@aporter.com

# ARNOLD & PORTER LLP

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 6


If you need to reach someone by telephone about this request, you also may contact my associate, Stuart Turner, at 202.942-5759.

Sincerely,

Ronald A. Schechter, Esq.
Attorney for Requester

Enclosures

# ARNOLD & PORTER LLP

### DECLARATION OF RONALD A. SCHECHTER
### IN SUPPORT OF REQUEST FOR EXPEDITED PROCESSING

I, Ronald A. Schechter, declare pursuant to 5 U.S.C. § 552 and 32 C.F.R. § 286.4(d)(3)(iv):

1.      I am a Partner at the law firm of Arnold & Porter, LLP.  I submit this declaration in support of the Freedom of Information Act Request filed today on behalf of Requester International Counsel Bureau, Kuwaiti Counsel for the families of Kuwaiti Citizens at Guantanamo Bay ("Requester").

2.      Requester is an organization concerned with, inter alia, the welfare of Detainees Fawzi Khaled Abdullah Fahad Al Odah; Fouad Mahmoud Al Rabiah; Khalid Abdullah Misha'al Al-Mutairi; and Fayiz Mohammed Ahmed Al Kandari ("Detainees"), all of whom are Kuwaiti.

3.      Former detainees have recounted that Detainees were subject to abusive conditions in Guantanamo *(see* Shafia Rasul, Asif Iqbal and Rhuhel Ahmed, *Composite Statement: Detention in Afghanistan and Guantanamo Bay,* ¶ 306 *(available at* http://www.statewatch.org/news/2004/aug/guantanamo-statement.pdf), and the media has similarly reported abuses of Requesters by the military's Extreme Reaction Force. *See* Rania El Gamal, *Kuwaiti Gitmo Detainees Speak Out About Abuse,* Kuwait Times, December 1, 2006 (former Kuwaiti detainees describing abusive conditions at Guantanamo); *AP, Three Britons allege abuses under U.S. custody at Guantanamo,* USA Today.com, August 4, 2004; David Rose and Gaby Hinsliff, US *Guards Filmed Beatings' at Terror* Camp, Observer.Guardian.uk.com, May 16, 2004 ).

4.      Numerous reports have been issued, which document the abuse of Guantanamo detainees, including the Detainees. *See, e.g.,* U.N. Econ. & Soc. Council [ECOSOC], Commission on Human Rights, *Situation of detainees of Guantanamo Bay, Report of the Chairperson of the Working Group on Arbitrary Detention,* U.N. Doc. E/CN.4/2006/120 (February 15, 2006).  These facts indicate that Detainees may have been threatened with or subject to unlawful punishments amounting to torture, to the detriment of their physical health.

5.      Detainees' families, physicians and counsel have limited means of determining the physical or mental conditions of the Detainees, and thus are denied the complete information necessary to permit them to take the steps to seek relief for their loved ones and clients based upon urgent medical or psychological need.  Detainees currently cannot obtain adequate medical care and treatment because their families and

# ARNOLD & PORTER LLP

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 8

physicians have no indication of what physical and/or behavioral symptoms they may display while in detention under extremely stressful conditions.

6.     Requester needs access to recorded evidence of the Detainees' condition and treatment at Guantanamo to ensure that they can receive proper medical and psychological treatment, the absence of which poses an imminent threat to their lives and physical safety.

7.     The United States Military has denied and continues to deny the Detainees' substantial due process rights. Detainees have been unlawfully detained by the U.S. Military in Guantanamo for more than six years without access to any legitimate legal process. There is reason to believe that Detainees were mistreated, tortured and abused, in violation of their substantial due process rights.

8.     There continues to be an intense humanitarian interest in the care and treatment of all current and former detainees, including Requesters, at Guantanamo by the United Nations, the International Red Cross, and the press. *See, e.g.*, Rania El Gamal, *Kuwaiti Gitmo Detainees Speak Out About Abuse,* Kuwait Times, December 1, 2006 (former Kuwaiti detainees describing abusive conditions at Guantanamo). Disclosing recorded evidence of Detainees' condition will therefore promote the "welfare and interest of mankind" and expedited processing is warranted.

I hereby declare that the foregoing is true and correct to the best of my knowledge.

Ronald A. Schechter

*EXHIBIT A*

APPROVED FOR PUBLIC FILING

PROTECTED INFORMATION REDACTED

## DECLARATION OF REAR ADMIRAL MARK H. BUZBY

I, Mark H. Buzby, am a Rear Admiral in the United States Navy with 28 years of
active duty service. I currently serve as the Commander of Joint Task Force –
Guantanamo (JTF-GTMO), at Guantanamo Bay, Cuba (Guantanamo). I have held this
position since May 22, 2007. As such, I am directly responsible for the successful
execution of the JTF-GTMO mission to conduct detention and interrogation operations
and exploit intelligence in support of the Global War on Terror, coordinate and
implement detainee screening operations, and support law enforcement and war crimes
investigations. In my capacity as Commander, I oversee all personnel assigned to, and all
operations of, JTF-GTMO. The information provided herein is true and correct to the
best of my knowledge, information, and belief.

1. On 19 December 2007, the Office of DoD General Counsel reiterated DoD
guidance to preserve all information relating to detainees. After receipt of that reiterated
guidance, I directed that this command confirm 100% compliance. As a result of actions
undertaken in connection with my direction, I have learned the information contained
herein with regard to digital recording systems that exist at the detention facilities
operated by JTF-GTMO.

2. The detainees at JTF-GTMO are housed in various detention camps.
Activities taking place in Camps 4, 6, Echo, and Iguana have been recorded 24 hours per
day, seven days per week (hereafter referred to as "full-time") by means of digital video
recording (DVR) systems that are part of the video monitoring systems that guards use to
ensure good order and discipline within the camps. In January 2008, it was brought to
my attention that such DVR systems may have been automatically overwriting video data

contained on recording devices, at predetermined intervals. That is, only a specified
number of days' worth of recorded data could be retained on the recording devices at a
time. The specified interval varies from system to system, as discussed below. Thus, a
DVR device on any given day would retain only data from the specified interval. On
each day, therefore, images from dates older than the applicable interval were
automatically overwritten. After an initial review determined that old data was being
overwritten automatically, on January 16, 2008, I ordered that all recording on such
systems be suspended to ensure that no data currently stored thereon was lost. The
interval at which recorded data was overwritten was determined by the technological
storage capacity of each recording device and was not deliberately or purposely set by
JTF-GTMO. JTF-GTMO has not yet identified technology currently available for use at
JTF-GTMO that would allow for the preservation of all data recorded on a full-time
basis.

3. In the camp known as Camp 4, a DVR system was utilized to record the day-
to-day activities of detainees and staff within the camp. The system was part of the
video-only monitoring system that was used by the guard staff to oversee activities in the
camp for the purpose of ensuring good order and discipline within the camp. On or about
May 18, 2006, the DVR system then in use was disabled to assist with the investigation
of a disturbance in Camp 4. This particular DVR system was not then again placed into
service in the camp. JTF-GTMO has possession of the original DVR system, consisting
of four separate recording devices, which was installed in Camp 4. We suspect that the
recording devices contain recorded data but we are unable technologically to confirm
whether data remains on the recording devices. JTF-GTMO will continue to preserve the

2

recording devices and any data thereon. Following the events of May 18, 2006, a more limited DVR system was installed in Camp 4 to monitor and record data pertaining to Yankee Block in Camp 4, the only block housing detainees following the disturbance of May 18, 2006. JTF-GTMO is in possession of the DVR system, consisting of one recording device, used for this purpose, but we are unable technologically to confirm whether data remains on the recording device. JTF-GTMO will continue to preserve the recording device and any data thereon.

4. On or about February 1, 2007, JTF-GTMO installed a new DVR system in Camp 4. This system, like the previous system, recorded video images observed by video-only cameras that were displayed on video monitoring screens in a central control booth. Like the original systems, the images that were recorded with this system consisted of video images of each housing bay and common areas of the camp. The DVR system operated on a full-time basis. Much of the information recorded showed routine or mundane day-to-day activities, such as guards patrolling camp areas, as well as detainees eating, praying, or recreating. As with the original systems, the video monitoring was done for security purposes and guard staff monitored the screens upon which the video images were shown. Recorded data was not routinely examined. As noted above, the technical capacities of the DVR system's recording devices were such that at certain intervals there was automatic overwriting of previously recorded data. Camp 4 used four such recording devices. Now that those systems have been suspended per my January 16, 2008 order, the information preserved on the four devices consists of data from the periods December 29, 2007 through January 16, 2008; January 5, 2008 through January 16, 2008; December 29, 2007 through January 16, 2008; and December

30, 2007 through January 16, 2008. As noted above, the system was disabled on January 16, 2008, to preserve data that was stored thereon.

5. In the camp known as Camp 6, a video-only DVR system (such as that used in Camp 4) was in use from on or about December 7, 2006, the date of the Camp's opening, until January 16, 2008. The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp. The Camp 6 DVR system covered common areas within the camp, but not cells. Camp 6 used four recording devices in its DVR system that automatically overwrote data in the same way, and under the same conditions that data was overwritten in Camp 4. Now that those systems have been suspended per my January 16, 2008 order, the information preserved on the four devices consists of data from the periods December 1, 2007 through January 16, 2008; December 3, 2008 through January 16, 2008; December 4, 2007 through January 16, 2008; and December 21, 2007 through January 16, 2008. As noted above, the system was disabled on January 16, 2008, to preserve data that was stored thereon. .

6. In the camp known as Camp Echo, a DVR system (such as was used in Camps 4 and 6) was utilized to record the day-to-day activities of detainees in the cells within the camp. The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp. A DVR system that was installed on an unknown date prior to April 12, 2006, operated until on or about October 1, 2006. That system consisted of two DVRs. JTF-GTMO is in possession of the DVR system used until October 1, 2006. JTF-GTMO is unable technologically to confirm whether data is stored on the devices

that were part of that old system. The old system was replaced by a new DVR system similar to the systems used in Camp 4 and Camp 6. The new DVR system monitored and recorded, full-time, the inside of detainees' cells and the back gate, but not common areas. As noted above, this new DVR system was disabled on January 16, 2008, to preserve data that was stored thereon. The information preserved on the new DVR system consists of data from the periods December 20, 2007, through January 16, 2008; and November 24, 2007, through January 16, 2008.

7. In the camp known as Camp Iguana, a DVR system (such as was used in Camps 4, 6, and Echo) was utilized to record the day-to-day activities of detainees within the camp. The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp. This system was replaced on or about October 12, 2007 by a new DVR system. JTF-GTMO is in possession of the old recording device that was replaced, but is unable technologically to confirm whether data is stored thereon. From October 12, 2007, until January 16, 2008, the new DVR system operated in the camp on a full-time basis when detainees were present in the camp. JTF-GTMO has not housed detainees permanently in this camp since the detainees classified as being "No Longer Enemy Combatants" were transferred from Guantanamo in November 2006. Since these detainees were transferred, Camp Iguana has been used primarily to facilitate habeas counsel visits with their detainee clients. As permitted by the Protective Orders applicable in these cases, JTF-GTMO conducted video monitoring of such meetings to ensure the safety and security of counsel and detainees. Video images of such meetings, therefore, would have been automatically recorded in the same manner as other video

images observed by the system. This system also has a standard overwrite function at a specified interval, but any recordings from December 26, 2007 through January 16, 2008, the date it was disabled, have been preserved. Recorded data of counsel-detainee meetings was not examined. As noted above, the system was disabled on January 16, 2008, to preserve data that was stored thereon.

8. Following my order on January 16, 2008 suspending operation of the automatic DVR systems, and at the present time, JTF-GTMO has installed an "on-demand" recording capability in Camps 4, 6, Echo, and Iguana, that is separate from the recording devices that were used prior to January 16, 2008. During this period of suspension, the guard staff has been directed to video record, on an "on-demand" basis, all significant events in Camp 4, 6, Echo, and Iguana, including: forced cell extractions; medical emergencies; incidents of suspected/alleged guard misconduct; incidents of possible self harm or injuries to detainees; significant damage to government property; mass disturbances by detainees; and any other similar events. The on-demand recording now used contains data that continues to be preserved and the guard staff has been directed to preserve any such recordings. Although the on-demand recording system is connected to the video monitoring system in each camp, it is not connected to the DVR system recording devices that contain previously preserved data, and can in no way jeopardize the data that is currently preserved on those devices.

9.



10. This declaration is not intended to provide a complete catalogue of all video and/or audio recordings made of detainees held at JTF-GTMO, although I am informed, and believe, that it is a complete discussion of those JTF-GTMO video and/or audio monitoring systems that included a standard recording feature as to which recorded data was automatically overwritten at specified intervals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date:   8 Feb 08

MARK H. BUZBY
Rear Admiral, United States Navy
Commander, Joint Task Force –
Guantanamo



**Pillsbury**
**Winthrop**
**Shaw**
**Pittman** LLP

2300 N Street NW
Washington, DC 20037-1122

Tel 202.663.8000
Fax 202.663.8007
www.pillsburylaw.com

March 31, 2008

David J. Cynamon
Phone: 202.663.8492
david.cynamon@pillsburylaw.com

**Via Certified Mail and Facsimile**

Will Kammer
Chief, Office of Freedom of Information
Department of Defense
1155 Defense Pentagon
Washington, DC 20301-1155

> Re:    **FOIA Request 08-F-0863**

Dear Mr. Kammer:

I am writing in connection with your letter dated March 20, 2008, to Ronald A. Schechter in response to his Freedom of Information Act ("FOIA") request dated March 12, 2008. Copies of the FOIA request and your response are attached.

In your response, you advise Mr. Schechter, "As you have not identified yourself as legal counsel for the named detainees, certain privacy protected information may be denied." In order to eliminate any possible privacy concerns, I am writing to advise you that, as legal counsel for the named detainees, I hereby join, as a requester, in Mr. Schechter's FOIA Request.

Sincerely,

David J. Cynamon

Enclosures

cc:    Ronald A. Schechter, Esq.

400786061v1 (2)



**Pillsbury**
**Winthrop**
**Shaw**
**Pittman**LLP

2300 N Street NW
Washington, DC 20037-1128

Tel 202.663.8000
Fax 202.663.8007
www.pillsburylaw.com

David J. Cynamon
Phone: 202.663.8492
david.cynamon@pillsburylaw.com

March 12, 2008

**VIA CERTIFIED MAIL AND FACSIMILE - (703) 696-4506**

Karen M. Finnegan
Office of Freedom of Information
Department of Defense
1155 Defense Pentagon
Washington, D.C. 20301-1155

Re:  **Freedom of Information Act Request**

Dear Ms. Finnegan:

This letter constitutes a request for medical records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et *seq.*, and corresponding regulations, on behalf of the following individuals who are presently detained at Guantanamo Bay Naval Base, Cuba ("Guantanamo"): Fouad Mahmoud A1 Rabiah and Fayiz Mohammed Ahmed Al Kandari (collectively, "Detainees"). Attached as Exhibit A you will find signed Authorizations For Disclosure of Information (DA FORM 5006, FEB 2003) authorizing the release of each Detainee's medical records to the undersigned counsel, as specified in more detail below. Please be advised that Requester, Pillsbury Winthrop Shaw Pittman LLP, seeks expedited processing of this request pursuant to 32 C.F.R. § 286.4(d)(3).

**I.  Records Sought**

Requester seeks all records of any and all persons or entities, including all persons acting on behalf of the United States, that in any way relate to, pertain to, or mention the medical condition of any or all of the Detainees as specified in more detail below. Requests for the specified records concerning Detainees will include any and all recorded material of any kind, in any form, whether recorded in writing, electronically, or by any other means that in any way concern, relate to, pertain to, refer to, or mention any or all of the Detainees. Requester seeks the following records:

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 2

A complete set of medical records and/or psychological records in the possession of the United States, its officials, employees or agents, including, without limitation:

a.  Any and all documents or other materials relating to any medical and/or psychological examination performed on Detainees by any person;

b.  Any and all records of inpatient, outpatient and emergency medical and/or psychological treatment, all clinical charts, reports, documents, correspondence, test results, statements, patient information sheets, questionnaires/histories, consent forms, notes, memoranda, records, protocols, intake forms, any physician/psychiatrist/psychologist notes, including any and all dictations;

c.  Any and all reports of results of any medical and/or psychological tests performed on Detainees (with or without their consent), as well as drafts or corrected versions of such reports, worksheets, underlying raw data, videos/recordings, still photographs, freeze-frames or other static representations of images. These include, without limitation, any laboratory, histology, cytology, pathology, radiology, immunohistochemistry, CT scan, MRI, EKG, echocardiogram, cardiac catheterization reports, and any film, picture, image, video, videotape, CD, DVD, reel, tracing, or any underlying data of any kind;

d.  Any and all records, materials, documents, or tangible things created by, furnished to or relied upon by any physician, doctor, psychiatrist, psychologist, nurse, physician's assistant, or any other person involved directly or indirectly with the healthcare or well being of the Detainees; and

e.  Any and all reports, records, logs, transcriptions, NDC numbers, and/or dictations of any drug, medication, medicine (including over-the-counter and prescription-only medicines), pharmacological agent, vaccine, blood, blood product, or active chemical that was given, ingested, injected, inhaled, transdermally applied, or otherwise used on or by Detainees with or without their knowledge and consent.

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 3

## II.    Requester Is Entitled to Expedited Processing

Expedited processing of a FOIA request is warranted here because there is a "compelling need for the information" by the Requester to gain access to the Detainees' medical records and records relating to their treatment at Guantanamo. 32 C.F.R. § 286.4(d)(3). A compelling need is present here because the failure to obtain records on an expedited basis could "reasonably be expected to pose an imminent threat to the life or physical safety" of the Detainees, because Detainees face an "imminent loss of substantial due process rights" and because of "humanitarian need." *Id.* §§ 286.4(d)(3)(i), 286.4(d)(3)(iv).

Numerous sources have reported a "profound deterioration" in the mental and physical health of many being held in Guantanamo. *See, e.g.,* AP, *Annan: Shut Guantanamo prison camp,* February 17, 2006 *(available at* www.cnn.com). For example, in February 2006, the U.N. Commission on Human Rights found that health professionals at Guantanamo had been "complicit in abusive treatment of detainees detrimental to their health." U.N. Econ. & Soc. Council [ECOSOC], Commission on Human Rights, *Situation of detainees of Guantanamo Bay, Report of the Chairperson of the Working Group on Arbitrary Detention,* T 75, U.N. Doc. E/CN.4/2006/120 (February 15, 2006). Quoting a report of the International Committee of the Red Cross, the U.N. Report noted that the healthcare of detainees had been compromised because an

> apparent integration of access to medical care within the system of coercion meant that inmates were not cooperating with the doctors. Inmates learn from their interrogators that they have knowledge of their medical histories and the result is that prisoners no longer trust the doctors.

*Id.* 176. Unsurprisingly, there are reports of Guantanamo detainees refusing necessary, even life saving, medical care because of the inadequacy of the medical facilities and medical care. *See, e.g.,* AP, *Attorney: Guantanamo detainee refuses to have heart procedure at base,* International Herald Tribune, November 19, 2006 *(available at* www.iht.com). Other reports have described serious mental problems emerging in the detainee population, with "many prisoners already in despair at being held in indefinite detention . . . some are dangerously close to full-blown mental and physical breakdown." *See* BBC News, *Guantanamo Conditions 'Worsening',* April 3, 2007 *(available at* http://news.bbc.co.uk/2/hi/americas/6526589.stm).

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 4

Despite these reports, neither the Detainees, their families, nor the public have been provided with complete information concerning Detainees' medical or psychological health or treatment, and there is reason to believe that Detainees may have been tortured and abused with the assistance of medical personnel given the repeated accounts of abuses of detainees by the military. *See, e.g.,* Shafra Rasul, Asif Iqbal and Rhuhel Ahmed, *Composite Statement: Detention* in *Afghanistan and Guantanamo Bay,* at ¶¶ 165-66, 273-79, 297, 306 *(available at* http://www.statewatch.org/news/2004/aug/guantanamo-statement.pdf) (former detainees describing unidentified forced injections performed by medical personnel; incompetent or withheld medical treatment; withholding of medical treatment as coercive interrogation measure; and "extremely harsh treatment" of Detainee Al Rabiah); Rania El Garnal, *Kuwaiti Gitmo Detainees Speak Out About Abuse,* Kuwait Times, December 1, 2006 (former Kuwaiti detainees describing abusive conditions at Guantanamo); Josh White, *U.S. Is Found Lacking in Detainee Care Plans,* Washington Post, July 9, 2005 (noting that Behavior Science Consultation Teams "had access to medical records at the U.S. detention facility in Guantanamo Bay, Cuba,"); AP, *Three Britons allege abuses under U.S. custody at Guantanamo,* USA Today.com, August 4, 2004; David Rose and Gaby Hinsliff, *US Guards Filmed Beatings' at Terror* Camp, Guardian Unlimited, May 16, 2004 *(available at* Observer.Guardian.uk.com); *Bosnian Citizens Imprisoned at Guantanamo Complain About Health Problems,* BBC Monitoring International Reports, August 3, 2004; Department of Defense/Department of Justice, *Working Group Report on Detainee Interrogations in the Global War on Terrorism: Assessment of Legal, Historical, Policy and Operational Considerations,* March 6, 2003 (rationalizing that compliance with international treaties and U.S. laws prohibiting torture could be overlooked because of legal technicalities and national security needs).

Because of their likely mistreatment at Guantanamo (and the complicity of medical personnel in that mistreatment), the failure of Requester to obtain the Detainees' medical records and records relating to their treatment on an expedited basis could reasonably be expected to pose an imminent threat to their life and physical safety. *Id.* § 286.4(d)(3)(i). Detainees currently cannot obtain adequate medical care and treatment because their physicians do not have access to their complete medical records, histories and files. Expedited processing is therefore warranted. *Id.*

Moreover, expedited processing is warranted because Detainees face an "imminent loss of substantial due process rights." 32 C.F.R. § 286.4(d)(3)(iv). Here, the denial of Detainees' substantial due process rights is not only imminent, but also present and on-going for the Detainees, as they are still detained. Neither the Detainees, their families, nor the public have been provided with information concerning Detainees' medical or

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 5

psychological health or treatment, and, given the repeated accounts of abuses of detainees and emergent medical and psychological crises among the detainee population cited above, there is reason to believe that Detainees were tortured and abused with the assistance of medical personnel, in violation of their substantial due process rights.

Finally, given the intense interest in the care and treatment of all detainees at Guantanamo by the United Nations, the International Red Cross, and the general public, disclosing Detainees' medical records and records relating to their treatment will promote the "welfare and interest of mankind" and expedited processing is therefore warranted. *Id.*

\*        \*        \*

There is no doubt that Detainees' medical records are maintained together in a manner readily accessible to the Department of Defense and its Components. *See, e.g.,* Lieutenant General Kevin C. Kiley, M.D., *Final Report: Assessment of Detainee Medical Operations for OEF, GTMO, and OIF, April 13, 2005 (available in redacted farm at* http://www.defenselink.mil/news/detainee investigations.html). In addition, Mary Wailing in the Department of Defense FOIA office confirmed to then Arnold & Porter attorney Darren Nicholson that DoD has detainee medical records in its possession and is already processing FOIA requests for those records. Thus, the health and medical records concerning each Requester should be readily accessible to the Department of Defense and its Components.

FOIA and Department of Defense implementing regulations provide that if some parts of records containing the requested information are exempt from mandatory disclosure, then non-exempt materials shall be disclosed after the exempt material has been deleted. *See* U.S.C. § 552(b); 32 C.F.R. § 286.23(d). Therefore, if you determine that some portion of a responsive record is exempt, please provide a copy of the remainder of the record. Additionally, if you determine that some or all of the requested records are exempt from disclosure, please provide a list or index of the records withheld, the exemption invoked, an estimation of the volume of records denied, and the reasons why a discretionary release of the records would not be appropriate under Department of Defense implementing regulations and the agency's FOIA policy. *See* 32 C.F.R. § 286.23(e). If you are aware of another Component of the Department of Defense that is or could be in possession of the requested records, please provide the name and address of the appropriate Component. Requester is willing to reimburse up to $5,000 for each Detainee for search and duplication fees incurred by the Department of Defense related to this request.

Office of Freedom of Information
Department of Defense
March 12, 2008
Page 6

      Thank you for your consideration of this request.  Please direct all future responses
to my attention at:

               David J. Cynamon
               Pillsbury Winthrop Shaw Pittman LLP
               2300 N Street, NW
               Washington, DC 20037-1122
               Tel:  202.663.8492
               Fax:  202.663.8007

      If you need to reach someone by telephone about this request, you also may
contact my colleague, Matthew J. MacLean, at 202.663.8183.

                    Sincerely,

                    David J. Cynamon, Esq.
                    Attorney for Requester

Enclosure

## DECLARATION OF DAVID J. CYNAMON
## IN SUPPORT OF REQUEST FOR EXPEDITED PROCESSING

I, David J. Cynamon, declare pursuant to 5 U.S.C. § 552 and 32 C.F.R. § 286.4(d)(3)(iv):

I am a Partner at the law firm of Pillsbury Winthrop Shaw Pittman LLP. I submit this declaration in support of the Freedom of Information Act Request filed today on behalf of Detainees Fouad Mahmoud Al Rabiah and Khalid Abdullah Misha'al Al-Mutairi ("Detainees").

Former detainees have recounted that Detainees were subject to abusive conditions in Guantanamo *(see Shafia Rasul, Asif Iqbal and Rhuhel Ahmed, Composite Statement: Detention in Afghanistan and Guantanamo Bay,* ¶ 306 *(available at* http://www.statewatch.org/news/2004/aug/guantanamo-statement.pdf)), and the media has similarly reported abuses of Detainees by the military's Extreme Reaction Force. *See* Rania El Gamal, *Kuwaiti Gitmo Detainees Speak Out About Abuse,* Kuwait Times, December 1, 2006 (former Kuwaiti detainees describing abusive conditions at Guantanamo); *AP, Three Britons allege abuses under U.S. custody at Guantanamo,* USA Today.com, August 4, 2004; David Rose and Gaby Hinsliff, US *Guards Filmed Beatings' at Terror* Camp, Observer.Guardian.uk.com, May 16, 2004 ).

Numerous reports have been issued, which document the abuse of Guantanamo detainees, including the Detainees, with the assistance of medical records and medical personnel. *See, e.g.,* U.N. Econ. & Soc. Council [ECOSOC], Commission on Human Rights, *Situation of detainees of Guantanamo Bay, Report of the Chairperson of the Working Group on Arbitrary Detention,* ¶ 75, U.N. Doc. E/CN.4/2006/120 (February 15, 2006). These facts indicate that Detainees may have been threatened with unlawful punishments amounting to torture with the assistance of medical personnel.

Detainees and their families and the public have not been provided with information concerning Detainees' medical health or treatment during their detention and neither Detainees nor their physicians have a complete set of Detainees' medical records and records relating to their treatment at Guantanamo.

Requester needs access to the Detainees' medical records and records relating to their treatment at Guantanamo to ensure that they can receive proper medical and psychological treatment, the absence of which poses an imminent threat to their lives and physical safety.

The United States Military has denied and continues to deny the Detainees' substantial due process rights. The Detainees have been unlawfully detained by the U.S. Military in Guantanamo for more than six years without access to any legitimate legal process. There is reason to believe that Detainees were mistreated, tortured and abused with the assistance of medical personnel, in violation of their substantial due process rights.

There continues to be an intense humanitarian interest in the care and treatment of all current and former detainees, including Detainees, at Guantanamo by the United Nations, the International Red Cross, and the press. *See, e.g.,* Rania El Gamal, *Kuwaiti Gitmo Detainees Speak Out About Abuse,* Kuwait Times, December 1, 2006 (former Kuwaiti detainees describing

abusive conditions at Guantanamo).  Disclosing Detainees' medical records and records relating to their treatment will therefore promote the "welfare and interest of mankind" and expedited processing is warranted.

I hereby declare that the foregoing is true and correct to the best of my knowledge.

David J. Cynamon

400776958v1

| MEDICAL RECORD | AUTHORIZATION FOR DISCLOSURE OF INFORMATION |
|---|---|
| | For use of this form, see AR 40-66; the proponent agency is Office of The Surgeon General. |

This form will not be used for authorization to disclose alcohol or drug abuse patient information from medical records or for authorization to disclose information from records of an alcohol or drug abuse treatment program. For authorization to disclose alcohol or drug abuse patient information, see 42 USC section 290dd, 42 CFR part 2, AR 40-66, and AR 600-85.

(Pursuant to the Privacy Act of 1974, 5 USC section 552a)

| PHYSICIAN OR MEDICAL TREATMENT FACILITY AUTHORIZED TO RELEASE INFORMATION | |
|---|---|
| JTF Guantanamo | It is understood that this authorization may be revoked at any time, if requested in writing, except to the extent that action will have already been taken. |

**PATIENT DATA**

| NAME (Last, First, MI) | DATE OF BIRTH (YYYYMMDD) | SOCIAL SECURITY/IDENTIFICATION NUMBER ISN available subject to appropriate confidentiality restrictions |
|---|---|---|
| AL KANDARI, FAYIZ | 1975/06/03 | |

| PERIOD OF TREATMENT (YYYYMMDD to YYYYMMDD) | TYPE OF TREATMENT |
|---|---|
| January 2002  TO  PRESENT | ☐ OUTPATIENT  ☐ INPATIENT  ☒ BOTH |

RESTRICTIONS ON INFORMATION (Specify)

None -- supply all information

**USE OF MEDICAL INFORMATION**

☐ FURTHER MEDICAL CARE  ☐ INSURANCE CLAIM(S)  ☒ ATTORNEY  ☐ DISABILITY DETERMINATION
☐ OTHER (Specify)

**INFORMATION DESTINATION**

INDIVIDUAL OR ORGANIZATION TO WHOM INFORMATION SHOULD BE RELEASED (Name and Address)

David J. Cynamon
Matthew J. MacLean
Osman Handoo
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC  20037

(ANY DISCLOSURE OF MEDICAL RECORD INFORMATION BY THE RECIPIENT(S) IS PROHIBITED EXCEPT WHEN IMPLICIT IN THE PURPOSES OF THIS DISCLOSURE)

**RELEASE AUTHORIZATION**

| I hereby request and authorize the named physician/medical treatment facility to release the medical information described above to the named individual/organization indicated. | DATE (YYYYMMDD) 2008/02/19 |
|---|---|
| SIGNATURE OF PATIENT/PARENT/GUARDIAN | RELATIONSHIP TO PATIENT Patient |

IMPRINT OF PATIENT IDENTIFICATION PLATE WHEN AVAILABLE

DA FORM 5006, FEB 2003     DA FORM 5006-R, NOV 1996, IS OBSOLETE.     USAPA V1.00

| تقرير طبي | موافقة لإبراز المعلومات |
|---|---|
| | لاستخدام هذا النموذج انظر AR 40-60، الجهة المقدمة هي مكتب وزير الصحة. |

هذا النموذج لن يستعمل للتفويض في كشف معلومات مريض الإدمان على المخدرات أو الكحول من السجلات الطبية أو للتفويض

في كشف المعلومات من سجلات برنامج معالجة الإدمان على المخدرات أو الكحول. للتفويض في كشف معلومات مريض الإدمان

على المخدرات أو الكحول، انظر

42 USC section 290dd, 42 CFR part 2, AR 40-66, and AR 600-85.

(مطابق إلى قانون السرية لعام 1974, 5 USC section 552a )

| الطبيب أو المؤسسة الطبية المخولة بإعطاء المعلومات | من المفهوم بأن هذا التفويض قد يسحب في أي وقت كان، إذا طلب كتابة، إلا إن كانت هناك إجراءات قد اتخذت. |
|---|---|

| بيانات المريض | | |
|---|---|---|
| الاسم (الأخير، الأول، الأوسط) | تاريخ الميلاد (يوم،شهر،سنة) | رقم الضمان الاجتماعي |
| | 1975/06/03 | AL ILANDANI, FAYIZ |
| فترة المعالجة (يوم،شهر،سنة إلى يوم،شهر،سنة) إلى | نوع المعالجة ☐ متعالج خارجي | ☐ متعالج داخلي    ☐ كلاهما |

قيود على المعلومات (تحدد)

| استخدام المعلومات الطبية ☐ عناية طبية بشكل أكبر ☐ أخرى (تحدد) | ☐ طلب/طلبات التأمين | ☐ محامي | ☐ إثبات إعاقة |
|---|---|---|---|

جهة المعلومات

الفرد أو المنظمة التي تمنح إليها هذه المعلومات (الاسم والعنوان)

(أي كشف للمعلومات الطبية المسجلة من قبل المستلم/المستلمين ممنوع ماعدا ما تتضمنه أغراض هذا الكشف)

| الموافقة على إطلاق سراح | |
|---|---|
| أنا أطلب بموجب هذا وأخول الطبيب / المؤسسة الطبية المسمى بنشر المعلومات الطبية الموصوفة في الأعلى إلى الفرد / المنظمة المشار إليها | التاريخ (يوم،شهر،سنة) 2008/02/19 |
| توقيع المريض /الوالد(ة)/الوصي | العلاقة بالمريض PATIENT |
| ختم بطاقة تعريف المريض إن وجدت | |

**DA FORM 5006, FEB 2003**    DA FORM 5006-R, NOV 1996, IS OBSOLETE.    USAPA V1.00

| MEDICAL RECORD | AUTHORIZATION FOR DISCLOSURE OF INFORMATION |
|---|---|
| | For use of this form, see AR 40-66; the proponent agency is Office of The Surgeon General. |

This form will not be used for authorization to disclose alcohol or drug abuse patient information from medical records or for authorization to disclose information from records of an alcohol or drug abuse treatment program. For authorization to disclose alcohol or drug abuse patient information, see 42 USC section 290dd, 42 CFR part 2, AR 40-66, and AR 600-85.

(Pursuant to the Privacy Act of 1974, 5 USC section 552a)

| PHYSICIAN OR MEDICAL TREATMENT FACILITY AUTHORIZED TO RELEASE INFORMATION | |
|---|---|
| JTF Guantanamo | It is understood that this authorization may be revoked at any time, if requested in writing, except to the extent that action will have already been taken. |

### PATIENT DATA

| NAME (Last, First, MI) | DATE OF BIRTH (YYYYMMDD) | SOCIAL SECURITY/IDENTIFICATION NUMBER ISN available subject to appropriate confidentiality restrictions |
|---|---|---|
| AL RABIAH, FOUAD | 1959-06-24 | |

| PERIOD OF TREATMENT (YYYYMMDD to YYYYMMDD) TO | TYPE OF TREATMENT | |
|---|---|---|
| January 2002 — PRESENT | ☐ OUTPATIENT  ☐ INPATIENT  ☒ BOTH | |

RESTRICTIONS ON INFORMATION (Specify)

None -- supply all information

### USE OF MEDICAL INFORMATION

☐ FURTHER MEDICAL CARE   ☐ INSURANCE CLAIM(S)   ☒ ATTORNEY   ☐ DISABILITY DETERMINATION
☐ OTHER (Specify)

### INFORMATION DESTINATION

INDIVIDUAL OR ORGANIZATION TO WHOM INFORMATION SHOULD BE RELEASED (Name and Address)

David J. Cynamon
Matthew J. MacLean
Osman Handoo
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC  20037

(ANY DISCLOSURE OF MEDICAL RECORD INFORMATION BY THE RECIPIENT(S) IS PROHIBITED EXCEPT WHEN IMPLICIT IN THE PURPOSES OF THIS DISCLOSURE)

### RELEASE AUTHORIZATION

| I hereby request and authorize the named physician/medical treatment facility to release the medical information described above to the named individual/organization indicated. | DATE (YYYYMMDD) 2008/02/19 |
|---|---|
| SIGNATURE OF PATIENT/PARENT/GUARDIAN | RELATIONSHIP TO PATIENT Patient |

IMPRINT OF PATIENT IDENTIFICATION PLATE WHEN AVAILABLE

DA FORM 5006, FEB 2003          DA FORM 5006-R, NOV 1996, IS OBSOLETE.                    USAPA V1.00

APPROVED FOR PUBLIC FILING

PROTECTED INFORMATION REDACTED

## DECLARATION OF REAR ADMIRAL MARK H. BUZBY

I, Mark H. Buzby, am a Rear Admiral in the United States Navy with 28 years of active duty service. I currently serve as the Commander of Joint Task Force – Guantanamo (JTF-GTMO), at Guantanamo Bay, Cuba (Guantanamo). I have held this position since May 22, 2007. As such, I am directly responsible for the successful execution of the JTF-GTMO mission to conduct detention and interrogation operations and exploit intelligence in support of the Global War on Terror, coordinate and implement detainee screening operations, and support law enforcement and war crimes investigations. In my capacity as Commander, I oversee all personnel assigned to, and all operations of, JTF-GTMO. The information provided herein is true and correct to the best of my knowledge, information, and belief.

1. On 19 December 2007, the Office of DoD General Counsel reiterated DoD guidance to preserve all information relating to detainees. After receipt of that reiterated guidance, I directed that this command confirm 100% compliance. As a result of actions undertaken in connection with my direction, I have learned the information contained herein with regard to digital recording systems that exist at the detention facilities operated by JTF-GTMO.

2. The detainees at JTF-GTMO are housed in various detention camps. Activities taking place in Camps 4, 6, Echo, and Iguana have been recorded 24 hours per day, seven days per week (hereafter referred to as "full-time") by means of digital video recording (DVR) systems that are part of the video monitoring systems that guards use to ensure good order and discipline within the camps. In January 2008, it was brought to my attention that such DVR systems may have been automatically overwriting video data

1

contained on recording devices, at predetermined intervals. That is, only a specified number of days' worth of recorded data could be retained on the recording devices at a time. The specified interval varies from system to system, as discussed below. Thus, a DVR device on any given day would retain only data from the specified interval. On each day, therefore, images from dates older than the applicable interval were automatically overwritten. After an initial review determined that old data was being overwritten automatically, on January 16, 2008, I ordered that all recording on such systems be suspended to ensure that no data currently stored thereon was lost. The interval at which recorded data was overwritten was determined by the technological storage capacity of each recording device and was not deliberately or purposely set by JTF-GTMO. JTF-GTMO has not yet identified technology currently available for use at JTF-GTMO that would allow for the preservation of all data recorded on a full-time basis.

3. In the camp known as Camp 4, a DVR system was utilized to record the day-to-day activities of detainees and staff within the camp. The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp. On or about May 18, 2006, the DVR system then in use was disabled to assist with the investigation of a disturbance in Camp 4. This particular DVR system was not then again placed into service in the camp. JTF-GTMO has possession of the original DVR system, consisting of four separate recording devices, which was installed in Camp 4. We suspect that the recording devices contain recorded data but we are unable technologically to confirm whether data remains on the recording devices. JTF-GTMO will continue to preserve the

recording devices and any data thereon. Following the events of May 18, 2006, a more limited DVR system was installed in Camp 4 to monitor and record data pertaining to Yankee Block in Camp 4, the only block housing detainees following the disturbance of May 18, 2006. JTF-GTMO is in possession of the DVR system, consisting of one recording device, used for this purpose, but we are unable technologically to confirm whether data remains on the recording device. JTF-GTMO will continue to preserve the recording device and any data thereon.

4. On or about February 1, 2007, JTF-GTMO installed a new DVR system in Camp 4. This system, like the previous system, recorded video images observed by video-only cameras that were displayed on video monitoring screens in a central control booth. Like the original systems, the images that were recorded with this system consisted of video images of each housing bay and common areas of the camp. The DVR system operated on a full-time basis. Much of the information recorded showed routine or mundane day-to-day activities, such as guards patrolling camp areas, as well as detainees eating, praying, or recreating. As with the original systems, the video monitoring was done for security purposes and guard staff monitored the screens upon which the video images were shown. Recorded data was not routinely examined. As noted above, the technical capacities of the DVR system's recording devices were such that at certain intervals there was automatic overwriting of previously recorded data. Camp 4 used four such recording devices. Now that those systems have been suspended per my January 16, 2008 order, the information preserved on the four devices consists of data from the periods December 29, 2007 through January 16, 2008; January 5, 2008 through January 16, 2008; December 29, 2007 through January 16, 2008; and December

30, 2007 through January 16, 2008. As noted above, the system was disabled on January 16, 2008, to preserve data that was stored thereon.

5. In the camp known as Camp 6, a video-only DVR system (such as that used in Camp 4) was in use from on or about December 7, 2006, the date of the Camp's opening, until January 16, 2008. The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp. The Camp 6 DVR system covered common areas within the camp, but not cells. Camp 6 used four recording devices in its DVR system that automatically overwrote data in the same way, and under the same conditions that data was overwritten in Camp 4. Now that those systems have been suspended per my January 16, 2008 order, the information preserved on the four devices consists of data from the periods December 1, 2007 through January 16, 2008; December 3, 2008 through January 16, 2008; December 4, 2007 through January 16, 2008; and December 21, 2007 through January 16, 2008. As noted above, the system was disabled on January 16, 2008, to preserve data that was stored thereon.

6. In the camp known as Camp Echo, a DVR system (such as was used in Camps 4 and 6) was utilized to record the day-to-day activities of detainees in the cells within the camp. The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp. A DVR system that was installed on an unknown date prior to April 12, 2006, operated until on or about October 1, 2006. That system consisted of two DVRs. JTF-GTMO is in possession of the DVR system used until October 1, 2006. JTF-GTMO is unable technologically to confirm whether data is stored on the devices

4

that were part of that old system.  The old system was replaced by a new DVR system similar to the systems used in Camp 4 and Camp 6.  The new DVR system monitored and recorded, full-time, the inside of detainees' cells and the back gate, but not common areas.  As noted above, this new DVR system was disabled on January 16, 2008, to preserve data that was stored thereon.  The information preserved on the new DVR system consists of data from the periods December 20, 2007, through January 16, 2008; and November 24, 2007, through January 16, 2008.

      7.  In the camp known as Camp Iguana, a DVR system (such as was used in Camps 4, 6, and Echo) was utilized to record the day-to-day activities of detainees within the camp.  The system was part of the video-only monitoring system that was used by the guard staff to oversee activities in the camp for the purpose of ensuring good order and discipline within the camp.  This system was replaced on or about October 12, 2007 by a new DVR system.  JTF-GTMO is in possession of the old recording device that was replaced, but is unable technologically to confirm whether data is stored thereon.  From October 12, 2007, until January 16, 2008, the new DVR system operated in the camp on a full-time basis when detainees were present in the camp.  JTF-GTMO has not housed detainees permanently in this camp since the detainees classified as being "No Longer Enemy Combatants" were transferred from Guantanamo in November 2006.  Since these detainees were transferred, Camp Iguana has been used primarily to facilitate habeas counsel visits with their detainee clients.  As permitted by the Protective Orders applicable in these cases, JTF-GTMO conducted video monitoring of such meetings to ensure the safety and security of counsel and detainees.  Video images of such meetings, therefore, would have been automatically recorded in the same manner as other video

images observed by the system. This system also has a standard overwrite function at a specified interval, but any recordings from December 26, 2007 through January 16, 2008, the date it was disabled, have been preserved. Recorded data of counsel-detainee meetings was not examined. As noted above, the system was disabled on January 16, 2008, to preserve data that was stored thereon.

8. Following my order on January 16, 2008 suspending operation of the automatic DVR systems, and at the present time, JTF-GTMO has installed an "on-demand" recording capability in Camps 4, 6, Echo, and Iguana, that is separate from the recording devices that were used prior to January 16, 2008. During this period of suspension, the guard staff has been directed to video record, on an "on-demand" basis, all significant events in Camp 4, 6, Echo, and Iguana, including: forced cell extractions; medical emergencies; incidents of suspected/alleged guard misconduct; incidents of possible self harm or injuries to detainees; significant damage to government property; mass disturbances by detainees; and any other similar events. The on-demand recording now used contains data that continues to be preserved and the guard staff has been directed to preserve any such recordings. Although the on-demand recording system is connected to the video monitoring system in each camp, it is not connected to the DVR system recording devices that contain previously preserved data, and can in no way jeopardize the data that is currently preserved on those devices.

9.



10. This declaration is not intended to provide a complete catalogue of all video and/or audio recordings made of detainees held at JTF-GTMO, although I am informed, and believe, that it is a complete discussion of those JTF-GTMO video and/or audio monitoring systems that included a standard recording feature as to which recorded data was automatically overwritten at specified intervals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: _8 FEB 08_

MARK H. BUZBY
Rear Admiral, United States Navy
Commander, Joint Task Force –
Guantanamo

7



**DEPARTMENT OF DEFENSE**
OFFICE OF FREEDOM OF INFORMATION
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

2 0 MAR 2008

Ref: 08-F-0863

Mr. Ronald A. Schechter
Arnold & Porter, LLP
555 12th Street, NW
Washington, DC 20004

Dear Mr. Schechter:

This is an interim response to your March 12, 2008, Freedom of Information Act (FOIA) request on behalf of the International Counsel Bureau, Kuwaiti Counsel for the families of Kuwaiti Citizens at Guantanamo Bay. You have requested access to all video, photographic, and other recorded documents for the following individuals detained at Guantanamo Bay: Fawzi Khaled Abdullah Fahad Al Odah (ISN 232); Fouad Mahmoud Al Rabiah (ISN 551); Khalid Abdullah Misha'al Al-Mutairi (ISN 213); and Fayiz Mohammed Ahmed Al Kandari (ISN 552). You specifically seek, "any recording, including any image, photograph, picture, film, drawing, painting, video, videotape, tape recording, audiotape, CD, or DVD, depicting or reflecting the image, likeness, voice, audible action, or any other aspect or activity of any Detainee." You have additionally requested expedited processing and agreed to pay $5,000 per detainee for search and duplication costs. We received your request on March 13, 2008, and assigned it FOIA case number 08-F-0863

You have requested expedited processing on the basis of a "compelling need for the information" based on an imminent threat to the life or physical safety of the Detainees. 32 C.F.R. § 286.4(d)(3). You have additionally requested expedited processing on the basis of an "imminent loss of substantial due process rights" and "humanitarian need". 32 C.F.R. § 286.4(d)(3)(i) and (iv). In support of your request you state that "numerous sources have reported a "profound deterioration" in the mental and physical health of many being held in Guantanamo". Despite these reports, neither the Detainees, their families, nor the public have been provided with any information regarding the health and safety of the Detainees". "No medical reports or records have been provided to the families, and there is reason to believe that Detainees may have been tortured and abused given the repeated accounts of abuses of detainees by the military, including specific references to at least one of the Detainees." That "Detainees' families, physicians and counsel have limited means of determining the physical or mental conditions of the Detainees, and thus are denied the complete information necessary to permit them to take the steps to seek relief for their loved ones and clients." You additionally state that the "denial of Detainees' substantial due process rights is not only imminent , but also present and on-going for as long as Detainees are detained" and that

"given the intense interest in the care and treatment of all detainees at Guantanamo by the United Nations, the International Red Cross, and the general public, disclosing recorded sounds, images, and other recordings will promote the "welfare and interest of mankind" and expedited processing is therefore warranted." By requesting expedited processing, you are asking that this Office place your request ahead of all other requests that were received before your request. After carefully considering your request for expedited processing, I have determined that your request does not meet the criteria of the above mentioned Department of Defense (DoD) standards for expedited processing; therefore, this request is denied.

I have determined that the Kuwaiti Counsel for the families of Kuwaiti Citizens at Guantanamo Bay should be placed in the "other" category for fee purposes, which affords them two hours of search time and 100 pages of duplication free of charge. Subsequent processing will be assessed at the established DoD fee rates of: clerical search and review time--$20 per hour; professional search and review time--$44 per hour; executive search and review time--$75 per hour; and document reproduction at $0.15 per page. You have stated that you are willing to pay up to $5,000 in processing fees for each detainee. As you have not identified yourself as legal counsel for the named detainees, certain privacy protected information may be denied.

You have also requested that we "provide a list or index of the records withheld, the exemption invoked, an estimation of the volume of records denied, and the reasons why a discretionary release of the records would not be appropriate under Department of Defense implementing regulations and the agency's FOIA policy." This type of index is commonly known as a Vaughn index. See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). It is well settled that a requester is not entitled to a Vaughn index at the administrative stage of processing FOIA requests. See Schwarz v. United States Dep't of Treasury, 131 F. Supp. 2d 142, 147 (D.D.C. 2000). Accordingly, your request for a Vaughn index is denied.

If you are not satisfied with my action on your request for expedited processing, you may submit an administrative appeal to James Hogan, Chief, Policy, Appeals and Litigation Branch, Office of Freedom of Information, 1155 Defense Pentagon, Washington, DC 20301-1155. Your appeal should be postmarked within 60 days of the date of this letter, should cite to case number 08-F-0863, and should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

for Will Kammer
Chief



**DEPARTMENT OF DEFENSE**
OFFICE OF FREEDOM OF INFORMATION
1155 DEFENSE PENTAGON
WASHINGTON, DC 20301-1155

2 0 MAR 2008

Ref: 08-F-0852

Mr. David J. Cynamon
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, NW
Washington, DC 20037-1122

Dear Mr. Cynamon:

This is an interim response to your March 12, 2008, Freedom of Information Act (FOIA) request on behalf of Fouad Mahmoud Al Rabiah (ISN 551) and Fayiz Mohammed Ahmed Al Kandari (ISN 552), for "all records of any and all persons or entities, including all persons acting on behalf of the United States, that in any way relate to, pertain to, or mention the medical condition of any or all of the Detainees..." Specifically, you have identified five separate categories of records that you are seeking. You have additionally requested expedited processing and agreed to pay $5,000 per detainee for search and duplication costs. We received your request on March 13, 2008, and assigned it FOIA case number 08-F-0852.

You have requested expedited processing on the basis of a "compelling need for the information" based on an imminent threat to the life or physical safety of the Detainees. 32 C.F.R. § 286.4(d)(3). You have additionally requested expedited processing on the basis of an "imminent loss of substantial due process rights" and "humanitarian need". 32 C.F.R. § 286.4(d)(3)(i) and (iv). In support of your request, you state that "numerous sources have reported a 'profound deterioration' in the mental and physical health of many being held in Guantanamo," and that, "neither the Detainees, their families, nor the public have been provided with complete information concerning Detainees' medical or psychological health or treatment, and there is reason to believe that Detainees may have been tortured and abused with the assistance of medical personnel given the repeated accounts of abuses of detainees by the military." You also state that the "Detainees currently cannot obtain adequate medical care and treatment because their physicians do not have access to their complete medical records, histories, and files." You additionally state that the "denial of Detainees' substantial due process rights is not only imminent , but also present and on-going for as long as Detainees are detained" and that, "given the intense interest in the care and treatment of all detainees at Guantanamo by the United Nations, the International Red Cross, and the general public, disclosing  Detainees' medical records and records relating to their treatment will promote the 'welfare and interest of mankind' and expedited processing is therefore warranted." By requesting expedited processing, you are asking that this Office place

your request ahead of all other requests that were received before your request. After carefully considering your request for expedited processing, I have determined that your request does not meet the criteria of the above mentioned Department of Defense (DoD) standards for expedited processing; therefore, this request is denied.

I have determined that you should be placed in the "other" category for fee purposes, which affords you two hours of search time and 100 pages of duplication free of charge. Subsequent processing will be assessed at the established DoD fee rates of: clerical search and review time--$20 per hour; professional search and review time--$44 per hour; executive search and review time--$75 per hour; and document reproduction at $0.15 per page. You have stated that you are willing to pay up to $5,000 in processing fees for each detainee.

You have also requested that we "provide a list or index of the records withheld, the exemption invoked, an estimation of the volume of records denied, and the reasons why a discretionary release of the records would not be appropriate under Department of Defense implementing regulations and the agency's FOIA policy." This type of index is commonly known as a Vaughn index. See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). It is well settled that a requester is not entitled to a Vaughn index at the administrative stage of processing FOIA requests. See Schwarz v. United States Dep't of Treasury, 131 F. Supp. 2d 142, 147 (D.D.C. 2000). Accordingly, your request for a Vaughn index is denied.

If you are not satisfied with my action on your request for expedited processing, you may submit an administrative appeal to James Hogan, Chief, Policy, Appeals and Litigation Branch, Office of Freedom of Information, 1155 Defense Pentagon, Washington, DC 20301-1155. Your appeal should be postmarked within 60 days of the date of this letter, should cite to case number 08-F-0852, and should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

for  Will Kammer
     Chief